In re Denise M. CURTIS, Debtor.

Denise M. Curtis, Plaintiff,

v.

LaSalle National Bank and EMC Mortgage Corp., as servicer for LaSalle National Bank as trustee, jointly and severally, Defendants.

Bankruptcy No. 00–42279.
Adversary No. 03–04020.

United States Bankruptcy Court,
D. Massachusetts.

March 31, 2005.

David G. Baker, Boston, MA, for debtor.

Robert F. Charlton, Ablitt and Caruolo, PC, Wakefield, MA, for EMC Mortgage Corp. and LaSalle National Bank.

Denise Pappalardo, Worcester, MA, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court is a "Motion to Reconsider the Judgment Dated October 29, 2004" (the "Motion to Reconsider"), filed in the above-captioned adversary proceeding. The Judgment complained of, *inter alia,* confirms the discharge of a second mortgage given by Denise M. Curtis (hereinafter the "Debtor") to LaSalle National Bank ("LaSalle"; the "LaSalle Mortgage") on her residence in Methuen, Massachusetts (the "Residence"); and further awards the sum of $53,220.00 to the Debtor against EMC Mortgage Corporation and LaSalle, pursuant to 11 U.S.C. §§ 362(h) and 105(a). Subsequent to that award, the Debtor filed a "Motion for Authorization to Disburse Funds" (the "Motion to Disburse") in her main bankruptcy case. The funds sought to be disbursed to her are the proceeds of the sale of the Residence. Because the Motion to Disburse relies upon the discharge of the

LaSalle Mortgage, the Court took the Motion to Disburse under advisement as well. For the reasons set forth below, the Motion to Reconsider will be denied and the Motion to Disburse allowed.

## I. FACTS [1] AND POSITIONS OF THE PARTIES

The Debtor and her late husband purchased the Residence in 1995. To finance the purchase, they borrowed funds from First Eastern Mortgage Corporation and granted a first mortgage to that entity. In 1997, the Debtor and her late husband borrowed an additional sum of $41,869.00 from a division of Superior Bank and granted Superior Bank a second mortgage on the property. Almost immediately, Superior Bank assigned the second mortgage to LaSalle, but retained the servicing rights to the mortgage until 2002, at which time they were assigned to EMC Mortgage Corporation ("EMC").

In July of 1999, the Residence suffered significant fire damage. The insurer, Patrons Mutual Insurance Company, failed to make payment to the Debtor and her husband on account of an arson investigation relative to the loss. The Debtor and her husband filed a Chapter 7 case in this Court in September of 1999. Described in their bankruptcy schedules were two encumbrances on the Residence: First Eastern Mortgage Corporation in first position in the amount of $80,000.00 and the LaSalle Mortgage in second position in the amount of $50,000.00. In Schedule A, the Debtor and her husband valued the Residence at $75,000.00. The Court issued notice of the bankruptcy case to all of the creditors listed in the schedules. In re-

---

**1.** This Court's findings of fact and conclusions of law as derived from the testimony and exhibits admitted at trial, as well as documents filed in this case to which the parties agreed the Court could take judicial notice.

(Trial Transcript, Page 4). As agreed, this Court did rely upon documents attached to and arguments made in the parties' various filings in connection with the Debtor's motion for summary judgment.

spect of the LaSalle Mortgage, notice was sent to the then servicer, Superior Bank. The case proceeded unremarkably and the Debtor and her husband received a discharge pursuant to 11 U.S.C. § 727 on January 12, 2000. The Court issued notice of the discharge to all of the creditors listed in the schedules. Again, in respect of the LaSalle Mortgage, notice of the discharge was sent to the then servicer, Superior Bank.

On February 22, 2000, LaSalle filed a motion for relief from the automatic stay in the Chapter 7 case, seeking leave to foreclose on its second mortgage. In that endeavor, LaSalle was represented by Attorney Amy Lee Lipman–White ("Attorney Lipman–White"). In its motion, LaSalle argued that relief should be granted because the Debtor enjoyed no equity in the property. LaSalle averred that the Residence had a fair market value of only $80,000.00 and a liquidation value of only $56,000.00. LaSalle's motion for relief from the automatic stay was granted. The Court also approved the Chapter 7 trustee's subsequent Notice of Abandonment of the Residence.

Having relieved herself of those debts dischargeable in a Chapter 7 case, the Debtor, now widowed, filed a Chapter 13 case on April 24, 2000.[2] The Debtor listed three encumbrances on the Residence in her schedules: Massachusetts Housing Finance Agency (assignee of First Eastern Mortgage Corporation) in first position securing a balance owed of $81,000.00; the LaSalle Mortgage in second position secur-

ing a balance owed of $52,000.00; and a Sears Roebuck & Co. lien in third position, securing a sum owed of $3,047.38. This time, the Debtor valued her residence at $70,000.00.[3] The Court issued notice of the Chapter 13 case to all of the creditors listed in the Debtor's schedules. In respect of the LaSalle Mortgage, notice was this time sent to LaSalle's counsel at the Law Office of Lipman–White. Attorney Lipman–White responded by filing her "Notice of Appearance and Request for All Orders and Other Papers" on behalf of LaSalle c/o Superior Bank. Attorney Lipman–White simultaneously filed a secured proof of claim on behalf of LaSalle in the amount of $54,880.10 (the "LaSalle Proof of Claim").

The Debtor's Chapter 13 plan (the "Plan") listed the LaSalle Mortgage amongst the secured claims, but treated it as a lien to be avoided in its entirety. With reference to the LaSalle Mortgage, the Debtor noted in her Plan:

> This creditor holds a second mortgage on the same residence. Personal liability for this debt was discharged in the debtor's previous chapter 7 case. Based on the creditor's Motion for Relief from the Automatic Stay dated February 22, 2000, filed in the previous Chapter 7 case, it appears that this mortgage is wholly unsecured. Accordingly, the claim is modified pursuant to 11 USC § 1322(b)(2) and deemed unsecured. The creditor shall receive no payments from the debtor or the Trustee. An Order of Discharge pursuant to 11 USC

---

**2.** Such a combination of bankruptcy case filings, while not commonplace, is permissible. *See Johnson v. Home State Bank*, 501 U.S. 78, 87, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

**3.** The reduction of the valuation from $75,000 in the Chapter 7 schedules to $70,000 in the Chapter 13 schedules was never explained. But even if the fair market value of the resi-

dence was $80,000, as alleged by LaSalle in its motion for relief from stay filed only two months earlier, the result for LaSalle would have been the same. The LaSalle Mortgage was wholly undersecured and therefore modifiable under § 1322(b)(2) to unsecured status. *See Domestic Bank v. Mann (In re Mann)*, 249 B.R. 831 (1st Cir. BAP 2000).

§ 1328 shall discharge the mortgage recorded in the Essex South Registry of Deeds at Book 4822 Page 2. SEE *In re Bartee*, [212 F.3d 277,] 2000 WL 621400 (C.A.5, 2000)

The Debtor served all of her creditors with the Plan. In respect of the LaSalle Mortgage, notice was sent not to LaSalle, but to its counsel, Attorney Lipman–White. On October 6, 2000, the Plan was confirmed without objection.

On October 24, 2000, the Debtor filed an objection to the LaSalle Proof of Claim, on the grounds that LaSalle was deemed unsecured by its collateral position and the underlying claim had been discharged in the previous Chapter 7 case. Notice of the objection was timely sent to Attorney Lipman–White by first class mail on October 18, 2000. Notice of the response deadline (December 7, 2000) and hearing (December 12, 2000) was sent to Attorney Lipman–White on November 8, 2000.[4] LaSalle did not respond or appear. The Court accordingly sustained the Debtor's objection to the LaSalle Proof of Claim. There was no request for reconsideration or appeal.

Over the next three (3) years, the Debtor successfully completed her Plan payments. She was also successful in settling with the insurer on her Residence, pursuant to which the settlement proceeds were paid to the first mortgagee who accepted same in full settlement of the first mortgage. The Debtor obtained a Chapter 13 discharge[5] on January 15, 2003 and the Court issued notice of the discharge to all scheduled creditors, including, in respect of the LaSalle Mortgage, Lasalle c/o Superior[6] and LaSalle c/o Attorney Lipman–White.

On January 29, 2003, the Debtor filed the instant adversary proceeding against LaSalle and EMC (jointly, the "Defendants"). The complaint included five counts. Count I sought a declaratory judgment that the LaSalle Mortgage had been discharged pursuant to the Chapter 13 discharge order. Count II sought an injunction against any action by the Defendants to foreclose on the LaSalle Mortgage. Count III sought sanctions against the Defendants for violations of the automatic stay. Count IV sought damages for emotional distress allegedly suffered by the Debtor as a result of the collection activities of the Defendants. Count V sought sanctions against EMC for violations of the Fair Debt Collection Practices Act (the "FDCPA").

---

4. The Debtor also served the objection and notice of hearing on LaSalle c/o Superior on December 9, 2000 by facsimile transmission. While that notice was ineffective to alter the rights of the parties with respect to the December 12, 2000 hearing, LaSalle, by its servicer, was put on notice yet again of the challenge made by the Debtor with respect to the LaSalle Mortgage.

5. 11 U.S.C. § 1328(a) provides in relevant part:
As soon as practicable after completion by the debtor of all payments under the plan, ... the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under Section 502 of this title ...

That section is then supported by 11 U.S.C. § 524(a) which provides in relevant part:
(a) A discharge in a case under this title-
...
(2) operates as an injunction against the commencement or continuation of any action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived ...

6. Neither Superior nor EMC had filed notice with the Court with respect to the change in servicing. That omission was, however, not surprising if one accepts the premise that they believed that the underlying claim and mortgage had been discharged.

The filing of the adversary proceeding was stimulated by various letters which the Debtor received in mid 2002 and early 2003 from EMC, notwithstanding the pendency of the Chapter 13 case and the subsequent Chapter 13 discharge. First to arrive was a joint letter of April 15, 2002 from EMC and Superior Bank seeking to notify the Debtor (and her deceased husband) that servicing of the second mortgage had been transferred from Superior Bank to EMC. Although the letter was not, strictly speaking, a demand for payment, it contained detailed information on how to make mortgage payments and stressed the importance of making payments and maintaining insurance on the Residence. It also advised the Debtor that the balance owed on the obligation secured by the second mortgage was $53,952.38. Debtor's counsel, David G. Baker ("Attorney Baker"), responded to the April 15, 2002 letter on June 6, 2002. There, he advised EMC that the subject mortgage had been discharged in a Chapter 13 bankruptcy case and provided the venue of the case and docket number. Although he advised EMC that the letter was a violation of the automatic stay, he graciously noted:

> Because it is possible that LaSalle did not inform you of the bankruptcy case, however, I am recommending to my client that she not seek damages for this violation at this time. Please be advised, however, that any further collection efforts will result in affirmative steps to obtain such damages.[7]

EMC responded to Attorney Baker's letter by sending him notices that his client was due for the April 20, 2000 payment. Those letters were sent on July 9, 2002, September 9, 2002, December 11, 2002 and January 7, 2003. Although each of these letters invited Attorney Baker to contact EMC if he disagreed, he did not do so. On January 3, 2003, EMC sent a letter to the Debtor (not copied to Attorney Baker) requesting information with respect to the alleged damage to the Residence. And on March 21, 2003 (after the date of discharge), EMC sent a "formal notice" to the Debtor, advising her that the loan was in default and that EMC intended to enforce the provisions of the note and mortgage.

The Defendants LaSalle and EMC responded to the instant complaint with a joint answer. Noteworthy among the various denials and statements of insufficient knowledge or information, the Defendants:

1. professed insufficient knowledge or information as to whether the Plaintiff was a Chapter 13 debtor, despite filing the answer in the Debtor's Chapter 13 case;

2. denied "as stated" the Debtor's allegation that the Defendants' attorney filed an appearance and proof of claim in the case;

3. professed insufficient knowledge or information as to whether EMC was the servicing agent for LaSalle or whether EMC or LaSalle had received various notices or taken other actions;

4. declined to answer whether the complaint was a core proceeding, notwithstanding Fed. R. Bankr.P. 7008; and

5. pled various affirmative defenses including expiration of statutes of limitation, laches, estoppel, waiver, unclean hands and the Plaintiff Debtor's lack of standing.[8]

---

7. This response by Attorney Baker provides fodder for those who promote the adage: "No good deed goes unpunished"—a view that this Court ordinarily does not hold.

8. Among the Defendants' frivolous defenses,

After completion of discovery, the Debtor sought summary judgment alleging that there were no genuine disputes of fact underlying her claims. What followed was an "Opposition to Debtor's Motion for Summary Judgment" filed by the Defendants, a "Memorandum in Response to Objection of EMC to Plaintiff's Motion for Summary Judgment" filed by the Debtor, and a "Defendants' Memorandum of Rebuttal to Plaintiff's Response to Objections of EMC" filed by the Defendants. Throughout this exchange, the Defendants asserted that the second mortgage was discharged in violation of their due process rights and therefore the discharge was invalid. They contended that they were entitled to a determination of whether any portion of their claim was secured pursuant to 11 U.S.C. § 506(a); that the two overlapping bankruptcy petitions were "confusing;" and that the Debtor provided inadequate notice to them. They further argued that there was no willful violation of the automatic stay and that the Debtor had failed to demonstrate damages. Finally, the Defendants argued that they had used their best efforts to contact Debtor's attorney prior to contacting the Debtor, and that they made no knowingly false representations.

After a hearing on the Debtor's Motion for Summary Judgment, the Court granted summary judgment in favor of the Debtor only with respect to liability for violations of the automatic stay on and after June 4, 2002. Damages and the remaining liability issues in the complaint proceeded to trial.

At trial, each party presented one witness. The Debtor testified on her own behalf. The Defendants presented a paralegal, Annette Anderson ("Anderson"), from the offices of EMC.

The Debtor testified that she had received the subject notices and they caused her great stress. The Debtor, now widowed, has been for several years the victim of a closed head injury, from which she had not fully recovered. She is significantly medicated. The Debtor testified that the letters caused stress, weight loss and vomiting. She sought medical treatment and was placed on anti-depressant medication.

Anderson testified that EMC had become the servicer for the LaSalle Mortgage in May of 2002. Anderson admitted that letters dated April 15, 2002 and January 3, 2003 had been sent to the Debtor by EMC. While Anderson conceded that the letters could be "construed" as collection letters, she opined that EMC was required to send them pursuant to federal law; specifically, that EMC was required to send these letters in compliance with the FDCPA and the Real Estate Settlement Procedures Act ("RESPA"). Anderson claimed that the April 15, 2002 letter was sent for the purpose of notifying the Debtor of a transfer in servicing from Superior Bank to EMC—what she termed a "goodbye/hello" letter and was also a debt validation letter. And the January 3, 2003 letter was a standard letter that was sent to borrowers when EMC learned of damage to its collateral. Anderson testified that there was no demand for payment in the body of the letter, but conceded that the bottom of the letter included a notice required by the FDCPA. Anderson also testified that after learning that the insurance funds had been paid to the first mortgagee, and were out of the reach of EMC, EMC had begun foreclosure proceedings

the Debtor's alleged lack of standing—to discharge a mortgage on her home and seek damages for violations of the automatic stay designed to protect her—is undoubtedly the most outrageous.

with respect to the property, but that "at this point we can't do anything because of the pending adversary. We have to wait till after all this is resolved."

Anderson came to the trial of this case with no knowledge of when EMC became aware of the bankruptcy case(s), nor was she able to testify as to what EMC was told about the status of the loan. She said the conversion of the servicing from Superior Bank to EMC was done electronically, with no human involvement whatsoever. She testified that the letters sent to the Debtor were computer generated after the transfer of thousands of files from Superior Bank to EMC.[9] Her testimony was less than informed and less than apologetic. Her demeanor reflected annoyance with the hearing and an arrogant impatience with the delay in foreclosure that was entailed by the instant proceeding. In her view, EMC had done everything possible to meet its obligations.

In his statements, the Defendants' counsel repeatedly returned to his contention that his clients had received insufficient notice of the attempt to discharge the La-Salle Mortgage and that insufficiency amounted to a denial of due process. Indeed, Defendant's counsel noted that this Court's own local rules require that objections to claims be served both on the creditors and their attorneys and Debtor's counsel failed to meet this requirement. *See* M.L.B.R 13–5.[10] The Defendants further complained that the Residence was undervalued by the Debtor in her Chapter 13 case and Plan,[11] and that that could have been demonstrated had they had the opportunity to do so. With respect to the alleged violations of the automatic stay and discharge injunction generated by their letters, the Defendants claimed to have been confused by the multiple filings, which confusion, they said, could have been avoided had Debtor's counsel made greater efforts to notify the Defendants as to the problem. The Defendants maintained that, given the complexity of their business, they acted reasonably and responsibly.[12]

At the conclusion of the trial, the Court made, *inter alia,* the following findings of fact and conclusions of law in open court: (1) the Defendants had notice of the Chapter 13 case actually and through their counsel and acted deliberately through their agents to send notices to the Debtor; (2) the Debtor suffered physical and emotional harm on account of those actions; and (3) the Debtor was entitled to compensatory damages in the amount of $15,000.00, attorney's fees in the amount of

9. It is not uncommon for institutional lenders to blame their computers for violations of the automatic stay. It is the modem version of "the dog ate my homework." The same computers, however, which are "taught" to act, can be "taught" not to act or to act differently. The lender who blames its computer for a bad act ordinarily does not lack the ability to have it fixed. That lender only lacks the motivation to have it fixed.

10. M.L.B.R. 13–5 provides, *inter alia:*
All motions and requests for orders must be served on the chapter 13 trustee, the debtor, the debtor's attorney, persons who have filed appearances and requested service of

all pleadings, and all creditors with the following exceptions:
. . .
(d) objections to claims shall be served on the chapter 13 trustee, the claimant, and the claimant's attorney

11. The Residence was sold in 2004 for the sum of $215,000.00, as further described below.

12. The Defendants did not pursue their earlier pleaded defenses with respect to standing, statutes of limitation, laches, estoppel or waiver.

$8,220.00,[13] and punitive damages in the amount of $30,000.00.

On the basis of the findings of fact and conclusions of law made in open court, the Court ordered and adjudged on the date of trial, October 29, 2004, that:

1. any and all indebtedness of the Debtor to LaSalle as of the date of the commencement of the Chapter 13 case (the "Debt"), together with the Lasalle Mortgage (the "Mortgage") were discharged and null and void;

2. LaSalle, EMC, their servicers, agents, attorneys and assigns, were permanently enjoined from taking any action whatsoever to collect the Debt or foreclose upon the LaSalle Mortgage;

3. by its actions, LaSalle and EMC had jointly and severally violated: (1) 11 U.S.C. §§ 362(a) and 1328(c) by making demand for payment of the Debt during the pendency of the Chapter 13 case and after the order discharging the Debt; (2) this Court's order, dated October 6, 2000 confirming the Debtor's Chapter 13 Plan and this Court's Order, dated January 15, 2003, discharging the Debtor after completion of the Chapter 13 Plan (by the same actions); and (3) the Fair Debt Collections Practices Act, 15 U.S.C. §§ 1692c(a)(2) and 1692e(2)(A) and (5) (the "FDCPA") (by communicating directly with the Debtor regarding the Debt despite knowledge that the Debtor was represented by counsel in connection with the Debt and by misrepresenting the status of the Debt in the said demands); and

4. pursuant to 11 U.S.C. §§ 362(h) and 105(a), judgment should be and hereby be entered in favor of the Debtor and against LaSalle and EMC, jointly and severally, in the total sum of $53,220.00, calculated as $15,000.00 in compensatory damages, $8,220 in attorney's fees and costs, and $30,000.00 in punitive damages.

In response to the Court's Judgment of October 29, 2004, the Defendants filed the instant Motion to Reconsider. EMC seeks reconsideration on the grounds that: 1) EMC became the senior mortgagee when the first mortgage on the Residence was paid; 2) the "record" shows that EMC was fully secured by the value of the Residence; 3) "EMC/LaSalle ... never received personal service" of the Chapter 13 plan; and 4) the Court never conducted a " § 506(a)" hearing to determine the secured status of EMC's mortgage and, accordingly, EMC was denied "its due process rights."

In addition, prior to trial in this matter, the Debtor filed a motion seeking leave to sell the Residence for the sum of $215,000.00. By assented to Order, dated July 23, 2004, the Court granted the Debtor leave to sell the Residence, but ordered that $95,000 of the sale price[14] be es-

---

**13.** On September 27, 2004, Attorney Baker filed an Application for Compensation with respect to work performed for the Debtor in this Adversary Proceeding (including 4 hours estimated for trial), seeking compensation in the amount of $8,020.00. The Application was served, *inter alia,* on the Defendants' counsel. No objection was filed. The Application was then allowed by Order entered on October 19, 2004. When the Court referenced its Order at trial, however, the Court misspoke and accounted for attorneys fees at $8,220.00, higher by $200.00. The Court now chooses not to rectify its error. The Application estimated four (4) hours for trial. That estimate has proven to be in error. Many more hours than that have been invested by Attorney Baker.

**14.** The remaining funds were paid to the Debtor.

crowed with Attorney Baker pending further Court order with any lien by EMC to attach to the funds. With the issuance of the October 29, 2004 Judgment, confirming the discharge of any lien held by EMC, the Debtor filed the Motion to Disburse seeking the release of the escrowed funds.

## II. DISCUSSION

### A. Standards for Reconsideration

■ It is well-settled in this district and elsewhere that:

> Arguments which were fully considered and rejected by the court the first time will not be considered when repeated by counsel the second time. In re Armstrong Store Fixtures Corp., 139 B.R. 347, 350 (Bankr.W.D.Penn.1992). To succeed on a motion to reconsider, the Court requires that the moving party show newly discovered evidence or a manifest error of fact or law. In re Mortgage Investors Corp., 136 B.R. 592, 598 (Bankr.D.Mass.1992).

In re Wedgestone Financial, 142 B.R. 7, 8 (Bankr.D.Mass.1992). "Initial arguments are not to be treated as a dress rehearsal for a second attempt to prevail on the same matter." Id.

Each of the arguments made in the Motion to Reconsider was raised at trial. No newly discovered evidence is offered. Absent this Court's recognition of some manifest error in its October 29, 2004 ruling, the Motion to Reconsider is yet another frivolous exercise by the Defendants. Accordingly, the Court will now reexamine the merits of the Defendants' arguments in search of any manifest error by the Court.

### B. Notice, due process and § 506(a)

The Defendants complain that there was never a " § 506(a) hearing" at which La-Salle had an opportunity to persuade the Court that the value of the Residence was sufficient to provide value for the second mortgage and thereby render it unmodifiable under 11 U.S.C. § 1322(b)(2). La-Salle was denied such an opportunity, they say, because of insufficient service of the Chapter 13 plan.

11 U.S.C. § 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, *is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property,* or to the extent of the amount subject to setoff, as the case may be, *and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.* Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(emphasis added).

■ Section 506(a) provides a definition of an allowed secured claim. It is not a section of the Bankruptcy Code which provides a methodology for determination of that claim. That methodology is provided by § 506(d) and effectuated by various alternative procedures, including by motion as set forth in Fed. R. Bankr.P. 3012, in a Chapter 11 plan as set forth by § 1123(a)(3), or in a Chapter 13 plan as set forth in 11 U.S.C. § 1322(b). Section 1322(b)(2) provides that a plan may:

> (2) modify the rights of holders of secured claims, other than a claim secures only by a security interest in real property that is the debtors principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims . . .

Modification may include converting a secured claim to an unsecured claim, even on a debtor's principal residence, where the claim is wholly unsecured. *Domestic Bank v. Mann (In re Mann)*, 249 B.R. 831 (1st Cir. BAP 2000). Modifying such a secured claim by stripping off its security may be accomplished through the Chapter 13 plan and no further notice, procedure or hearing is required. *McDonough v. Plaistow Cooperative Bank (In re McDonough)*, 166 B.R. 9, 14 (Bankr.D.Mass.1994); *Lee Servicing Co. v. Wolf (In re Wolf)*, 162 B.R. 98, 108 (Bankr.D.N.J.1993); *In re Lee*, 156 B.R. 628, 630 (Bankr.D.Minn. 1993), *aff'd* 162 B.R. 217 (D.Minn.1993). *Contra, In re Linkous*, 990 F.2d 160 (4th Cir.1993); *Wright v. Commercial Credit Corp.*, 178 B.R. 703 (E.D.Va.1995).

■ Here, the treatment which rendered the LaSalle claim unsecured was clearly set forth in the Debtor's Plan, and neither LaSalle nor its servicer responded. The Court confirmed the Plan and that order of confirmation was *res judicata* as to the treatment of the LaSalle claim. The deadline to revoke confirmation, other than on account of fraud (not claimed by the Defendants) has long since expired. 11 U.S.C. § 1330(a) (2004) ("On request of a party in interest at any time within 180 days after the date of the entry of an order of confirmation under section 1325 of this title, and after notice and a hearing, the court may revoke such order if such order was procured by fraud."); Fed. R. Bankr.P. 9024 ("... a complaint to revoke an order confirming a plan may be filed only within the time allowed by § 1144, § 1230, or § 1330"). Furthermore, the Defendants have never, even to this date, filed any request, by motion or adversary proceeding, seeking to revoke or modify the confirmation order.

■ But if there is anything to the argument that there should be a separate hearing in which attention is specifically paid to the modification of the LaSalle claim on account of the valuation of the collateral (a position with which this Court respectfully disagrees), that concern was clearly met here by the Debtor's post-confirmation objection to the LaSalle Proof of Claim. The Debtor objected to that claim because she deemed the claim now unsecured and therefore discharged in the previous Chapter 7 case. Again, neither LaSalle nor its servicer responded. The objection was sustained, the claim was disallowed and that order became final. To this date, there has never been any request to revoke this Court's order sustaining the Debtor's objection to the LaSalle Proof of Claim.[15]

■ All that is left to the Defendants is to argue that the orders confirming the Plan and sustaining the objection to the LaSalle Proof of Claim must fail on account of such an insufficiency of notice to LaSalle or its servicer as to deny LaSalle due process of law. Here, again, the Defendants are completely unconvincing.

The Defendants first say that service was insufficient because the two over-

---

**15.** Even were such a request now granted, the Defendants have proffered no credible evidence that, during the relevant time period, their second mortgage did have value. The Defendants' complaint that the Residence was sold in 2004 for over $200,000.00 is meaningless. The Plan was filed in 2000. The Defendants do not say that the Residence had that value in 2000—nor could they. Just months earlier, in the Chapter 7 case, LaSalle had itself asserted in its motion seeking relief from the automatic stay that the Residence had a fair market value of only $80,000.00 and a liquidation value of only $56,000.00. If indeed the Residence had then had a value well in excess of those sums and the Chapter 7 Trustee failed to object to the motion relying on the Defendants' valuation, the Defendants would, in any event, be judicially estopped from increasing that valuation.

lapping bankruptcy petitions created "confusion," but this is simply impossible to accept from sophisticated creditors with sophisticated bankruptcy counsel. It is important to note that Attorney Lipman–White filed notices of appearance in both the Chapter 7 and Chapter 13 cases. She was not confused and, if she was, it is telling that she was not presented by the Defendants as a witness at trial. And, even in the unlikely event that there was confusion, the prejudice arising therefrom should befall the Defendants and not the Debtor.

The Defendants' second argument regarding notice is equally unavailing. They say that the Debtor's service upon counsel to LaSalle and Superior Bank was insufficient to comply with the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and/or the Massachusetts Local Bankruptcy Rules, and therefore violated their due process rights. Specifically, the Defendants point the Court to 11 U.S.C. § 1324, Fed. R. Bankr. P.2002 and M.L.B.R. 13–5. 11 U.S.C. § 1324 provides:

> After notice, the court shall hold a hearing on confirmation of the plan. A part in interest may object to confirmation of the plan.

Fed. R. Bankr.P.2002 provides, *inter alia:*

> ... the clerk, or some other person as the court may direct, shall give the debtor, the trustee, *all creditors* and indenture trustees not less than 25 days notice by mail of ... the time fixed for filing objections and the hearing to consider confirmation of a chapter 9, chapter 11, or chapter 13 plan.

(emphasis supplied). The Defendants next turn to M.L.B.R. 13–5, which provides, *inter alia:*

> All motion and requests for orders must be served on the chapter 13 trustee, the debtor, the debtor's attorney, persons

who have filed appearances and requested service of pleadings, and all creditors with the following exceptions:

> . . .
>
> (d) objections to claims shall be served on the chapter 13 trustee, *the claimant,* and the claimant's attorney

(emphasis supplied). More to the point regarding service of the Plan, M.L.B.R. 13–4 provides:

> (b) Service of Plan. Concurrently with the filing of the plan, the debtor or the debtor's attorney shall cause a copy of the plan to be served by first class mail upon the chapter 13 trustee, *all creditors of the debtor,* all attorneys who have filed appearances and requested service of pleadings, and other parties in interest. The debtor or his attorney shall file with the plan a certificate of service.

(emphasis supplied).

■ None of these Code sections or rules require that the confirmation order or the order disallowing the LaSalle Proof of Claim should now be reconsidered on due process grounds. It has been repeatedly held that service upon counsel who appears in an action on behalf of a party satisfies that party's due process right to notice. *See, e.g., Rogers v. Palmer,* 102 U.S. 263, 26 L.Ed. 164 (1880); *McKinney v. Waterman S.S. Corp.,* 925 F.2d 1 (1st Cir.1991); *Ringgold Corp. v. Worrall,* 880 F.2d 1138 (9th Cir.1989); *Devers v. Frankina (In re Frankina),* 29 B.R. 983 (Bankr.E.D.Mich.1983). While the referenced rules do direct that service and notice be sent both to the creditor and its counsel, the Defendants' complaint with respect thereto is here presented in the wrong context, untimely and without merit. The Defendants have not filed motions to vacate the complained of orders. They have not filed an adversary proceeding to

reestablish their mortgage or even a counterclaim in this proceeding. Instead, they have employed their arguments as collateral attacks on orders which have been final for over four (4) years. And even if the Defendants now attempted to seek reconsideration of the subject orders, their effort would be in vain in light of their utter failure to demonstrate that they were in any way unfairly prejudiced by their entry. *See supra* note 15. They have presented no evidence to suggest that had LaSalle and its servicer, in addition to their attorney, received notice, the result would have been any different.

It is undisputed that Attorney Lipman–White was counsel for LaSalle and its servicer. It is undisputed that Attorney Lipman–White received service of, *inter alia,* the Order of Discharge in the Chapter 7 case, the notice of filing in the Chapter 13 case, the objection to the LaSalle Proof of Claim, the Plan, the Order of Confirmation of the Plan, and the Order of Discharge in the Chapter 13 case. All of the Defendants' due process rights to service and notice were fully satisfied by service upon Attorney Lipman–White. When presented with the opportunity to object to discharge in the Chapter 7 case, the Defendants' attorney remained silent. When presented with the opportunity to defend their Proof of Claim in the Chapter 13 case, the Defendants' attorney remained silent. When presented with the opportunity to object to the Chapter 13 Plan, the Defendants' attorney remained silent. The Defendants may not now, after the Chapter 13 discharge, cry foul.

Indeed, this Court does not believe that the foregoing arguments have been made by the Defendants to vindicate their due process rights. Instead, the foregoing arguments have been raised by the Defendants as a thinly veiled, and vainly made, effort to locate a viable defense to and distract the Court from their obvious violations of the automatic stay and discharge injunction. But now, the defenses having been demonstrated to be lacking in any merit, and the distraction stratagem having proved unsuccessful, the Court turns to the essence of this matter.

C. *Enforcement of the Automatic Stay and Discharge Injunction*

 The automatic stay and discharge injunction are cornerstones of bankruptcy law. They are, respectively, a fundamental debtor protection and a fundamental debtor objective. *See, e.g., In re A & J Auto Sales, Inc.,* 223 B.R. 839 (D.N.H.1998); *In re Perrin,* 233 B.R. 71 (Bankr.D.N.J.1999); *In re Borowski,* 216 B.R. 922 (Bankr.E.D.Mich.1998); *In re Hutchins,* 216 B.R. 1 (Bankr.E.D.Ark. 1997); *In re Thomas,* 184 B.R. 237 (Bankr. M.D.N.C.1995); *New Milford Sav. Bank v. Jajer,* 52 Conn.App. 69, 726 A.2d 604 (1999). The automatic stay assists debtors in regaining their financial footing by allowing them to do so free from collection efforts. *In re Vierkant,* 240 B.R. 317 (8th Cir. BAP 1999). And, having successfully completed the bankruptcy process, discharge provides debtors with a "new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439 (1st Cir.2000) (quoting *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970)). But the automatic stay and discharge injunction must be enforced to provide any meaningful protection or incentive. *See In re Rosa,* 313 B.R. 1, 6 (Bankr.D.Mass.2004) (quoting to *In re Soares,* 107 F.3d 969, 971 (1st Cir.1997)). 11 U.S.C. § 362(h) provides for two separate types of damages for violations of the automatic stay: actual damages and (in appropriate circumstances) punitive dam-

ages.[16] 11 U.S.C. § 105 provides for damages for violations of the discharge injunction[17]

■ The record is clear that the Defendants repeatedly violated the automatic stay and then the discharge injunction. Notwithstanding notice of the pendency of the Chapter 13 case (their counsel having actually filed an appearance in the case), Superior Bank and EMC, servicers for LaSalle, sent the "goodbye/hello" letter, dated April 15, 2002. The letter was inappropriate on more than one level. First, it represented a, albeit polite, request for payment.[18] Second, it notified the Debtor of her obligation to pay a discharged debt.[19] Although Attorney Baker then notified EMC directly of the pendency of the case by his letter of June 6, 2002, EMC followed with letters to Attorney Baker, dated July 9, 2002, September 9, 2002,

16. 11 U.S.C. § 362(h) provides:
An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

17. While 11 U.S.C. § 524 does not provide a remedy for debtors or former debtors who have suffered a violation of the discharge injunction, bankruptcy courts may employ their powers pursuant to 11 U.S.C. § 105 to enforce a discharge injunction and order damages. *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 445 (1st Cir.2000).

18. The April 15, 2002 letter included the following statements:
*PAYMENT INFORMATION:*
- The date that **Superior** will stop accepting payments from you is **April 30, 2002**. The date that **EMC** will start accepting payments from you is **May 1, 2002**. After **April 30, 2002**, please send all payments directly to **EMC**. Enclosed you will find a special coupon and envelope for your use in remitting your payment to EMC. Please be sure to write your new **EMC** loan number on your check or money order.
- In May 2002, you will receive a billing statement or instructions and coupons for submitting future payments. If, for any reason, you do not receive the information, you may submit your payment by writing your loan number on your check or money order and mailing it to: EMC Mortgage Corporation, P.O. Box 660530, Dallas, TX 75266-0530
EMC Mortgage Corporation (hereinafter referred to as "EMC") is the servicer of the above referenced loan (hereinafter referred to as the "Debt"). Because this Debt was delinquent on April 2, 2002 when the servicing transfer to EMC was in progress, EMC is a "debt collector" for the purposes of the Federal Fair Debt Collections Practices Act. EMC is writing you in an attempt to collect the Debt and any information obtained by EMC may be used for that purpose.
This letter is formal notice of the following:
1. As of April 2, 2002, the records reflect that the total amount of the Debt is $53,952.38
Please be advised that accrued interest, fees, corporate and escrow advances, and other charges may have been assessed to your account during the period prior to the completion of the transfer and prior to receipt of any payments. Therefore, the total amount due on the day your payment is received by EMC may have increased. In the event that EMC receives a remittance for less than the total amount due and additional funds are required to apply your payment, you will be contact before EMC applies the funds.
On the backside of the first page of the April 15, 2002 letter, and without the capital letters and bold print employed for other sections of the letter, was the following statement:
If your loan is in bankruptcy, this letter is for notification purposes only. If your personal repayment obligations have been discharged in a Chapter 7 case, this is not an attempt to impose personal liability on you.

19. The Court acknowledges, but discounts, the unhighlighted language in the April 15, 2002 letter, which suggests that, in the event of discharge in a Chapter 7 case, no personal liability is asserted. This reservation is of little moment. The lender was continuing to insist that the Debtor make payments on the discharged second mortgage.

December 11, 2002 and January 7, 2003 demanding payment. The January 3, 2003 letter to the Debtor demanding information with respect to damage to the property was threatening if the Debtor chose not to comply.[20] And the March 21, 2003 letter was a rank statement of default and intention to foreclose.[21]

20. The January 3, 2003 letter also included the following statements:

> NOTICE: EMC Mortgage Corporation is writing to you regarding the collection of your loan. Any information obtained may be used for that purpose.

21. The March 21, 2003 letter included the following statements:

> You are hereby provided formal notice by the Servicer (EMC Mortgage Corporation), as authorized by the Creditor of the above-referenced loan (hereinafter referred to as "the Debt") that you are in default under the terms and conditions of the Note and Security Instrument (i.e. Deed of Trust, Mortgage, etc.) for failure to pay the required installments when due, **and important data regarding that information is found on page one and two of this document.**
>
> This letter serves as further notice that EMC Mortgage Corporation intends to enforce the provisions of the Note and Security Instrument. You must pay the full amount of the default on this loan by the thirty-fifth (35th) day from the date of this letter which is 04/25/2003 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter). If you do not pay the full amount of the default, EMC Mortgage Corporation shall accelerate the entire sum of both principal and interest due and payable, and invoke any remedies provided for in the Note and Security Instrument, including but not limited to the foreclosure sale of the property. If you received a bankruptcy discharge which included this debt, this notice is not intended and does not constitute an attempt to collect a debt against you personally. Notice provisions may be contained within your mortgage/deed of trust which notice may be required prior to foreclosure.
>
> You are hereby informed that you have the right to "cure" or reinstate the loan after acceleration and the right to assert in the

■■■ Inasmuch as the Defendants intended the acts of sending the letters at a time when they had actual knowledge of the pendency of the automatic stay and discharge injunction, they are liable for compensatory damages, including attorneys fees, and, if appropriate, punitive damages.[22]

> foreclosure proceeding the non-existence of a default or any other defense you may have to acceleration and sale.
>
> **As of 03/20/2003 the amount of the debt that we are seeking to collect is $34, 494.05,** which includes the sum of payments that have come due on and after the date of default **11/20/1998,** any late charges, periodic adjustments to the payment amount (if applicable), and expenses of collection. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day that you pay may be greater. Please contact EMC Mortgage Corporation at 1-888-609-2379 on the day that you intend to pay the full amount due on your account. This letter is in no way intended as a payoff statement for your mortgage, it merely states an amount necessary to cure the current delinquency.
>
> Please note, however, that your right to cure this default as referenced herein does not suspend your payment obligations. Pursuant to the terms of the Note, failure to pay this default by **04/04/2003** will result in the assessment of an additional late charge, and your **04/20/2003** installment is still due on **04/20/2003** (or if said date(s) falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter). In addition, any advances made by the Servicer to protect their lien position must be added to the total amount necessary to cure the default. Please disregard this notice if a payment sufficient to cure the default has already been sent.

22. The original complaint sought damages only for violations of the automatic stay pursuant to 11 U.S.C. § 362(h), and not for violations of the discharge injunction pursuant to 11 U.S.C. § 105(a). It is undisputed that the letter sent to the Debtor on March 21, 2003 was sent after discharge was entered and, thus, a claim based on that communication

In assessing compensatory damages, this Court was and is guided by the First Circuit case of *Fleet Mortgage Group v. Kaneb*, 196 F.3d 265 (1st Cir.1999). In *Kaneb*, the debtor suffered a decline in social invitations and accompanying emotional distress on account of that creditor's violation of the automatic stay. *Id.* The First Circuit upheld an award of $25,000.00 for emotional distress and $18,220.68 for attorney's fees as appropriate compensatory damages. Here, the Debtor credibly testified that the letters caused stress, weight loss and vomiting; and that she sought medical attention and was placed on anti-depressant medication. This Court's award of $15,000.00 in compensatory damages was hardly unreasonable. Further, this Court's award of $8,220.00 in attorney's fees and costs was not only appropriate, but had already been allowed by the Court without objection from the Defendants.

Appropriate circumstances in which to award punitive damages is a discretionary matter that has been entrusted to the bankruptcy courts. *Clayton v. King (In re Clayton)*, 235 B.R. 801, 811 (Bankr. M.D.N.C.1998); *In re Hendry*, 214 B.R. 473 (Bankr.E.D.Va.1997). But where there has been an "arrogant defiance" of the Bankruptcy Code, punitive damages are most appropriate. *In re Medlin*, 201 B.R. 188 (Bankr.E.D.Tenn.1996). Here,

the defiance was far from subtle. Not only did the Defendants violate the automatic stay and discharge injunction, but, when the Debtor brought the matter before the Court, they responded with frivolous and meritless defenses.

Creditors accused of violation of the automatic stay and/or discharge injunction often have colorable defenses, some of which carry the day and some do not. Those defenses may legitimately question whether they had actual notice of the stay or injunction; or whether a debtor was damaged in the amount claimed; or even whether the stay or injunction was applicable. But the Defendants here not only repeatedly violated the stay and then violated the discharge injunction, but filed frivolous defenses in their pleadings (lack of standing, expiration of the statute of limitation, laches, estoppel, waiver) and repeatedly proffered meritless and frivolous arguments relative to their lack of notice. The Court could have reacted to such conduct by ordering the Defendants to show cause why they should not be sanctioned under Fed. R. Bankr.P. 9011(c)(1)(B). Indeed, the time for doing so has not passed. Yet, there is a larger point to be made. When an institutional creditor responds to an obvious violation of the automatic stay or discharge injunction against a consumer debtor by employing its superior resources

could only be brought as a violation of the discharge injunction pursuant to 11 U.S.C. § 105(a). Here, however, the Defendants implicitly consented to trial on the alleged violation of the discharge injunction. *See* Fed. R. Bankr.P. 7015(b) (providing that "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings"); *see also, DCPB, Inc. v. City of Lebanon*, 957 F.2d 913, 917 (1st Cir.1992); *In re Byers*, 312 B.R. 22 (Bankr.D.Mass.2004). The Defendants were on notice that the Debtor was pursuing the unpled claim for violation of the discharge

injunction. The Debtor raised the issue of the March 21, 2003 letter in her Motion for Summary Judgment; the March 21, 2003 letter was included in exhibits that the parties stipulated to be admitted at trial; and the Defendants presented testimony from Anderson regarding the March 21, 2003 letter. These arguments and evidence would otherwise be wholly immaterial to the Debtor's other claims. After trial, this Court found that the March 21, 2003 letter was a violation of the discharge injunction. The Defendants have not sought reconsideration based on the Debtor's failure to plead under 11 U.S.C. § 105(a) in the original complaint.

to make frivolous responses that tax the resources of that debtor, those responses should be viewed as nothing more than an abusive continuation of the original improper conduct being complained of. It is the most appropriate occasion for imposition of punitive damages.

 The amount in which punitive damages should be awarded is, likewise, a fact specific determination within the discretion of the bankruptcy courts. *In re Rosa*, 313 B.R. at 8; *see also e.g., Clayton v. King (In re Clayton)*, 235 B.R. 801, 811 (Bankr.M.D.N.C.1998); *In re Timbs*, 178 B.R. 989, 997–98 (Bankr.E.D.Tenn.1994); *In re Klein*, 226 B.R. 542, 545 (Bankr. D.N.J.1998). Punitive damages should be awarded in an amount sufficient to serve their purpose of deterrence. *See In re Klein*, 226 B.R. 542 (Bankr.D.N.J.1998); *In re Georgeff*, 226 B.R. 852 (Bankr. S.D.Ohio 1998); *In re Wills*, 226 B.R. 369 (Bankr.E.D.Va.1998). What would be sufficient to deter one creditor may not even be sufficient to gain notice from another. Punitive damages must be tailored not only based upon the egregiousness of the violation, but also based upon the particular creditor in violation.

 After trial, this Court awarded $30,000.00 (a rounded number slightly more than equal to the amount of the compensatory damages and attorneys fees) as an appropriate award of punitive damages to suit the nature of the violation and to serve as a deterrent to repetitive conduct by the Defendants and those who might be encouraged to make their actions a template. In light of the subsequent filing of the Motion to Reconsider and its allegations similarly devoid of merit, it may be that this Court failed to choose a number high enough to ensure deterrence. If so, future punitive damage awards against these Defendants, if necessary, will have to be adjusted accordingly.

III. *CONCLUSION*

For all the foregoing reasons, the Motion to Reconsider will be DENIED. The Motion to Disburse will be GRANTED. Separate orders in conformity with this Memorandum of Decision shall enter herewith.

### *ORDER*

For the reasons set forth in this Court's Memorandum of Decision of even date in Adversary Number 03–04020, the Debtor's "Motion for Authorization to Disburse Funds" is GRANTED.

### *ORDER*

For the reasons set forth in this Court's Memorandum of Decision of even date, the Defendants' "Motion to Reconsider the Judgment Dated October 29, 2004" is DENIED.