# United States Court of Appeals

## For the First Circuit

No. 05-2510

IN RE: VITO ANTHONY LAFATA,

Debtor.

EASTERN SAVINGS BANK, FSB,

Appellant,

v.

VITO ANTHONY LAFATA,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

No. 06-9009

IN RE: VITO ANTHONY LAFATA,

Debtor.

EASTERN SAVINGS BANK, FSB,

Appellant,

v.

VITO ANTHONY LAFATA; DENISE M. PAPPALARDO, TRUSTEE,

Appellees.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
OF THE FIRST CIRCUIT

Before

Torruella, <u>Circuit Judge</u>,
Stahl, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

———————————

<u>Howard M. Brown</u>, with whom <u>James M. Liston</u>, <u>Thomas M. Looney</u>, and <u>Bartlett Hackett Feinberg P.C.</u> were on brief, for appellant. <u>Laurel E. Bretta</u>, with whom <u>Bretta & Grimaldi, P.A.</u>, was on brief, for appellees.

———————————

April 3, 2007

———————————

**STAHL, <u>Senior Circuit Judge</u>.** At issue in this case of first impression is whether the Bankruptcy Code's protection of mortgage lenders against modification of claims secured by a principal residence applies when the residence in fact lies mostly on a lot abutting the mortgaged property. This case arises out of a bizarre set of facts. The debtor in this case and his then-wife mistakenly built a house on the property line between two lots owned by the debtor's ex-wife, a fact which was not discovered until after a mortgage on the lot believed to include the house had already been granted. Compounding this problem is the fact that everyone -- the debtor, the bank, and the bankruptcy court -- was mistaken as to who owned what property when. Despite this confusion, the bankruptcy court and the Bankruptcy Appellate Panel thoroughly addressed the dispositive issues, and we affirm.

## I. Background

The issues here center around two contiguous pieces of property: 26 Jasper St. (the "Jasper Lot")[1] and 31 Enfield Ave. (the "Enfield Lot") in Methuen, Massachusetts. Vito Anthony LaFata (the "Debtor") resides in a house that straddles the property line between the Jasper Lot and the Enfield Lot, with the majority of the house on the Enfield Lot, but with a street address of 26

---

[1]It appears from the record that the Jasper Lot is actually two separate parcels, one of which is a five-foot-wide strip. For simplicity, we will refer to them collectively as the "Jasper Lot."

Jasper St.[2]  Both properties were originally owned by a realty trust controlled by Gail Ness,[3] formerly the wife of the Debtor. As part of an earlier divorce settlement, Ness deeded the Jasper Lot to the Debtor.  Importantly, both Ness and the Debtor had the mistaken belief at the time of the deed that the house lay entirely on the Jasper Lot.  This erroneous belief was the first of two mistakes that resulted in this case being before us today.

In July 2003, still with the mistaken belief that his house was entirely on the Jasper Lot, the Debtor mortgaged the property to Eastern Savings Bank, FSB ("Eastern"), the appellant here.  Eastern's title work did not disclose that the majority of the Debtor's residence actually lay on the Enfield Lot.[4]  In connection with the mortgage, the Debtor executed a note for $165,000, secured solely by the Jasper Lot.  It appears that he never made any of the payments due on the note.

Following the grant of the mortgage to Eastern, Ness agreed to transfer the Enfield Lot to the Debtor in exchange for money owed to Ness by the Debtor under their original divorce

[2]The Enfield Lot also contains other structures, which are not relevant to the issues here.

[3]Gail Ness is also referred to in the record as Gail LaFata and Gail Raulinaitis.  We will refer to her as "Ness" for simplicity.

[4]It is unclear what the source of the mistake was.  There is some indication in the record that an erroneous plot plan existed, a fact which may have been discovered when the Debtor applied for work permits from the city.

settlement, apparently unaware of the title issue. Pursuant to this agreement, Ness executed a deed, dated June 4, 2004, purporting to transfer the Enfield Lot to the Debtor. However, because the payments were never made, the deed was never actually delivered to the Debtor for recording purposes. Instead it was held in escrow by Ness's attorney pending the payment of the additional funds owed by the Debtor to Ness. According to the record, because of nonpayment of the agreed-upon amount, Ness remains the owner of the Enfield Lot today. Hence the second mistake: the Debtor seemed to misunderstand this escrow arrangement, and during his bankruptcy proceedings operated with the mistaken belief that he was the fee simple owner of the Enfield Lot.

On August 5, 2004, the Debtor filed for Chapter 13 bankruptcy protection, claiming as assets both the Jasper Lot and the Enfield Lot. At some point not clear from the record the Debtor had become aware that his residence was not entirely on the Jasper Lot, but was instead mostly on the Enfield Lot.[5] This encroachment made the Jasper Lot noncompliant with zoning, which essentially destroyed its value. An appraisal commissioned by the Debtor noted that, if compliant, the land would probably be worth around $100,000, but in its current state the property was worth

---

[5]According to the record, Eastern also became aware of this fact as early as March 2004, when it first filed a claim with its title insurance company.

only "what the neighbor will pay for it" -- a value the appraiser estimated at $18,500.

Eastern filed a proof of claim for the full value of its mortgage, which it placed at $195,340, including delinquent interest and collection fees. On August 18, 2004, the Debtor filed an objection to this proof of claim, as well as a motion for determination of secured status under 11 U.S.C. § 506 and a proposed Chapter 13 plan.

As part of his proposed Chapter 13 plan, the Debtor sought to bifurcate Eastern Bank's claim into secured and unsecured portions, with the secured portion worth only $18,500, the appraised value of the collateral. That left, according to the Debtor, $131,500 in unsecured debt,[6] for which the Debtor proposed to pay 10 cents on the dollar. Eastern thus stood to receive only $31,650 on a claim that may have been worth as much as $195,340. Eastern understandably objected to this. On August 27, 2004, it filed a response to the objection to the proof of claim, an objection to the motion for determination of secured status, and an objection to confirmation of the Chapter 13 plan.

Further complicating matters, the City of Methuen also filed an objection to the Debtor's motion for determination of secured status on or around August 20, in which it stated that,

---

[6]This would place the total value of Eastern's claim at $150,000. It's not clear from the record how the Debtor arrived at this figure, given that the face value of the note was $165,000.

-6-

according to the registry of deeds, the Enfield Lot was actually owned by Ness.  The Debtor responded on August 27 by providing the court with a copy of the July 4, 2004, deed of the Enfield Lot from Ness to the Debtor -- the same deed that was subsequently discovered to be still in escrow.  The bankruptcy court and Eastern appeared to believe the Debtor's assurances that he owned the property and did not pursue the issue of ownership further.[7]

The three objections raised by Eastern each depend on whether 11 U.S.C. § 1322(b)(2) would allow Eastern's claim to be bifurcated as proposed by the Debtor.  The bankruptcy court ruled in favor of the Debtor on December 8, 2004, and allowed the bifurcation of the claim into a secured claim of $18,500 and an unsecured claim for the balance of the note.  Eastern appealed to the U.S. District Court for the District of Massachusetts, which affirmed the bankruptcy court on July 7, 2005, without opinion. Eastern appeals from the district court's decision, and that appeal is the first of the two appeals before us today.

Following the bankruptcy court orders, Eastern began an adversarial action against the Debtor in bankruptcy court on January 19, 2005, seeking to reform the mortgage so as to include at least that portion of the Enfield Lot that included the Debtor's

---

[7]Eastern justifies its reliance on what it knew to be an unrecorded deed by pointing out that, even if the deed was not recorded, it would still be valid as against the Debtor and Ness. Of course, this assumes that the deed was at least validly delivered, which it was not.

residence.  During depositions for that proceeding, Ness and the Debtor both testified that the Enfield Lot was actually still owned by Ness.  At that point Eastern moved for relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure.[8]  Eastern asked that the bankruptcy court vacate the three orders it had earlier decided in favor of the Debtor, citing newly discovered evidence and fraud on the court.

The bankruptcy court held a show cause hearing on October 7, 2005, to confirm whether the deed was in fact in escrow and whether it could be delivered to the Debtor.  The court concluded that it could not be delivered.  On October 21, the bankruptcy court denied the Rule 60(b) motion, saying only that Eastern "failed to meet its burden."

Eastern appealed the denial of the Rule 60(b) motion to the Bankruptcy Appellate Panel ("BAP") for the First Circuit, which affirmed.  Eastern appealed to us, and that appeal makes up the second of the two appeals before us.

## II. Discussion

### A. The Bankruptcy Court's Orders

On appeal from a district court's review of a bankruptcy court decision, we review the bankruptcy court's legal conclusions de novo and its factual conclusions for clear error.  Brandt v.

---

[8]Bankruptcy Rule 9024 makes Rule 60(b) applicable in bankruptcy.

-8-

Repco Printers & Lithographics, Inc. (In re Healthco Int'l Inc.),
132 F.3d 104, 107 (1st Cir. 1997).

Eastern's appeal from the bankruptcy court's orders
raises three issues: whether the bankruptcy court correctly
interpreted § 1322(b)(2) of the Bankruptcy Code as allowing
bifurcation here; whether Eastern was allowed a reasonable
opportunity to object to the valuation of the Jasper Lot
collateral; and whether the bankruptcy court correctly applied the
burden of proof.[9]

1. Section 1322(b)(2)

Section 1322(b)(2) of the Bankruptcy Code states that a
Chapter 13 plan may:

> modify the rights of holders of secured
> claims, other than a claim secured only by a
> security interest in real property that is the
> debtor's principal residence, or of holders of
> unsecured claims, or leave unaffected the
> rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2). Prior to Nobelman v. American Savings
Bank, 508 U.S. 324 (1993), there was some disagreement among the
circuits as to whether § 1322(b)(2) allowed for bifurcation of
undersecured homestead mortgages, such as the one at issue here.
See, e.g., Bellamy v. Fed. Home Loan Mortgage Corp. (In re

---

[9]Eastern also raises a fourth issue: whether the bankruptcy
court properly relied on Eastern's failure to attempt to reform the
mortgage when it allowed the bifurcation. That rationale is only
relevant in the case where the Debtor owns the Enfield Lot -- which
he does not. Therefore, we do not consider the issue, nor do we
place any weight on it in our analysis of the bifurcation issue.

Bellamy), 962 F.2d 176, 179 (2d Cir. 1992) (holding that §
1322(b)(2) only prohibits modification of the secured claim, but
that the existence and size of the secured claim must be determined
according to § 506(a)).  In Nobelman, the Supreme Court held that
§ 1322(b)(2) barred modification of the entire claim -- secured and
unsecured portions -- if the claim is secured by the debtor's
principal residence.[10]  508 U.S. at 332.  Therefore, in the instant
case, if Eastern's claim is secured by the Debtor's principal
residence, then the claim cannot be modified by bifurcating it into
secured and unsecured claims, even though the value of the security
is roughly one-tenth the value of the claim.

Despite mistakenly believing that the Debtor owned the
Enfield Lot, the bankruptcy court did still rule on this question
under the correct set of facts.  Ironically, this confusing case is
helped somewhat by confusion on a related issue: should a court
make the determination of what is the debtor's "primary residence"

---

[10]Justice Stevens explained the policy behind § 1322(b)(2):

> At first blush it seems somewhat strange that
> the Bankruptcy Code should provide less
> protection to an individual's interest in
> retaining possession of his or her home than
> of other assets. The anomaly is, however,
> explained by the legislative history
> indicating that favorable treatment of
> residential mortgagees was intended to
> encourage the flow of capital into the home
> lending market.

Nobelman, 508 U.S. at 332 (Stevens, J., concurring).

for purposes of § 1322(b)(2) at the time of the mortgage, the time of the petition for bankruptcy protection, or some other time? Compare In re Smart, 214 B.R. 63, 68 (Bankr. D. Conn. 1997) (mortgage date), with In re Wetherbee, 164 B.R. 212, 215 (Bankr. D.N.H. 1994) (petition date); see also GMAC Mortgage Corp. v. Marenaro (In re Marenaro), 217 B.R. 358, 360 (B.A.P. 1st Cir. 1998) (noting the uncertainty).  Because the issue is not settled, the bankruptcy court analyzed the applicability of § 1322(b)(2) from both the mortgage date and the petition date.[11]

The un-transferred deed from Ness to the Debtor was dated after the Debtor mortgaged the property to Eastern.  Therefore, at the time of the mortgage, the Debtor owned the Jasper Lot and did not claim to own the Enfield Lot.  In analyzing the applicability of § 1322(b)(2) at that point in time, the bankruptcy court said that:

> the Bank had and continues to have a mortgage on the [Jasper Lot] which is burdened with an encroachment.  Assuming without deciding that the physical presence of a significant amount [of] the residence on the [Jasper Lot] would be sufficient to bring the [Jasper Lot] within the rubric of "primary residence," [Eastern] has failed to prove that an eight to ten foot encroachment is the main part, the principal part, or even an important part of the Debtor's residence.  Indeed, from the pictures provided to the Court by the Debtor, it

---

[11]Because in fact the ownership did not change between the time of the mortgage and the time of the petition, the issue of what point in time to determine the "principal residence" is not relevant to this appeal.

> appears that the encroachment may only be an
> unenclosed deck.  This is not a situation
> where a mortgagee has a lien on the primary
> residence that is comprised of two separately
> deeded parcels and the debtor is attempting to
> sell the unimproved lot.  This is a case where
> the Bank did not take a mortgage on the
> improved lot.  To hold that the Bank has a
> mortgage on the primary residence when
> admittedly it does not hold a mortgage on the
> [Enfield Lot] is akin to the tail wagging the
> dog.

Eastern does not challenge the bankruptcy court's finding that the encroachment is not "the main part, the principal part, or even an important part" of the residence.  Therefore, the question before us is whether even some nominal encroachment by a debtor's principal residence on a mortgaged property will trigger the anti-modification protections of § 1322(b)(2).  We hold that it does not.

We begin with the language of the statute.  See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980) ("the starting point for interpreting a statute is the language of the statute itself").  The key phrase in the statute is "secured only by a security interest in real property that is the debtor's principal residence."  11 U.S.C. § 1322(b)(2).  Eastern argues that the statute is satisfied as long as the debtor resides on the mortgaged property.  But that simply begs the question of what constitutes "residing" when a party actually resides mostly on the

adjacent property.[12] The text of the statute provides little help in answering this question. <u>See</u> <u>Lomas Mortgage, Inc.</u> v. <u>Louis</u>, 82 F.3d 1, 4 (1st Cir. 1996) (finding the text of the statute ambiguous as to whether § 1322(b)(2) bars modification of a mortgage secured by a multi-family dwelling).

In <u>Lomas</u>, we also reviewed the legislative history of § 1322(b)(2), which we do not repeat here. <u>See</u> <u>id.</u> at 4-6. In that case, we noted that the most that could be said of the legislative history was that "Congress wanted to benefit the residential mortgage market as opposed to the entire real estate mortgage market." <u>Id.</u> at 5. The concern was that without these protections, mortgage lenders would be too conservative in their lending. <u>Id.</u> This dovetails with Justice Stevens's concurrence in <u>Nobelman</u>, where he notes that § 1322(b)(2) was "intended to encourage the flow of capital into the home lending market." 508 U.S. at 332 (Stevens, J., concurring).

This policy of preferring mortgage lenders to other lenders in bankruptcy does not necessarily extend to those cases where the lender has failed to exercise reasonable due diligence,

---

[12]Eastern's argument here is that the Debtor should be estopped from denying his "judicial admission" that he resides at, in the Debtor's words, "26 Jasper St." This is without merit. First, the record is clear that his residence has a street address of 26 Jasper St., even if the majority of the house actually lies on the Enfield Lot. Second, there is no dispute that this house is, indeed, his principal residence. The question is only whether enough of that principal residence lies on the Jasper Lot to trigger § 1322(b)(2).

however. Congress's concern is with a well-functioning home lending market, and that market depends in part on mortgage lenders working with due diligence to minimize risk for themselves, and the mortgage market in general. The problem Eastern faces here is as a result of its own failure to properly examine the title to the Jasper Lot before taking the mortgage from the Debtor.[13]  Had it done so, it would have found the cloud on the title and dealt with it accordingly. We see no reason why § 1322(b)(2) should be used to correct this error.

We and other courts have interpreted § 1322(b)(2) narrowly, even after the Nobelman decision. See, e.g., Scarborough v. Chase Manhattan Mortgage Corp. (In re Scarborough), 461 F.3d 406, 411 (3d Cir. 2006) (§ 1322(b)(2) does not bar modification where claim secured by multifamily dwelling, and noting policy of reading § 1322(b)(2) "literally and narrowly"); Zimmer v. PSB Lending Corp. (In re Zimmer), 313 F.3d 1220, 1226-27 (9th Cir. 2002) (§ 1322(b)(2) does not bar modification where claim is wholly unsecured because of prior lien on primary residence); In re Mann,

---

[13]We understand that the diligence is often delegated to other parties, and that the risk of situations like this are usually covered by title insurance policies. For whatever reason, those systems broke down here. Regardless of whether Eastern may have claims against other parties, it nonetheless must still bear the primary loss for that breakdown. Cf. Focus Inv. Assocs., Inc. v. Am. Title Ins. Co., 992 F.2d 1231, 1236 (1st Cir. 1993) (collecting cases holding that mortgagees and other title insurance holders cannot recover their loan losses from title insurance companies on the basis of a negligent title search by the insurer).

249 B.R. 831, 835-37 (B.A.P. 1st Cir. 2000) (same, and collecting cases); Lomas, 82 F.3d at 4. The policy of encouraging mortgage lending does not require § 1322(b)(2) to be interpreted expansively. Indeed, if we were to allow Eastern's more expansive reading of § 1322(b)(2) here, we could face cases in the future of lenders seeking its protection even when they had never intended to lend against a debtor's principal residence. For example, suppose Eastern and the debtor had a different mistaken belief at the time of the mortgage: that the residence was entirely on the un-mortgaged Enfield Lot, not the Jasper Lot. Under such circumstances, where Eastern intended to take a mortgage only on the undeveloped lot, should it be allowed then to claim the benefits of § 1322(b)(2) upon discovering that the residence actually encroached on the mortgaged property? The policy behind § 1322(b)(2) would not be served, since Eastern would not have taken the mortgage as a home lender. But the arguments that Eastern has presented here would be equally as applicable in that situation; the mortgaged property would be just as much the Debtor's "principal residence" as it is in the instant case. The only difference we can see is that the parties had intended the loan in this case to be a home mortgage loan when it was granted. But the statute is silent as to intent and as to type of mortgage; it asks only the objective question of whether the mortgaged property "is the debtor's principal residence." Furthermore, we

-15-

are loath to create a rule that would require courts in the future to have to inquire into the parties' subjective beliefs as to whether a particular mortgage of real property was intended to be a home mortgage or not, especially when the costs of an alternative rule are small and contained.

Our ruling today does no more than say that the anti-modification provisions of § 1322(b)(2) will not apply if the debtor's principal residence only encroaches on the mortgaged property.[14] Lenders can easily avoid this if they do what they have always had the responsibility to do: perform proper due diligence, title examination, and, if necessary, a land survey. The result of our holding is, of course, a windfall for the Debtor. If the facts were as he believed them to be when he took the mortgage loan, he would not be able to strip the loan down by over $100,000. But if we held in Eastern's favor, there would instead be a windfall for the bank. This is not a case where a lender has watched the value of its collateral go down gradually until it is worth less than the loan. Here, the property was <u>never</u> worth as much as Eastern's loan. If it had foreclosed the day after granting the loan, it would have received roughly the same as it receives now: collateral worth $18,500 and an unsecured claim for the balance of the loan.

---

[14]We have no view on the question of how much of a residence must be on the secured property for it to no longer be an "encroachment," except to say that it is more than appears in this case.

Given its lack of due diligence, we see no reason why the result should be otherwise.[15]

### 2. Collateral Valuation

Eastern also claims that it did not receive adequate notice of an intent to value the collateral. It raises this argument because it failed to object during the valuation hearing, and ordinarily that means that the Debtor's valuation is upheld by default. See Enewally v. Wash. Mut. Bank (In re Enewally), 368 F.3d 1165, 1173 (9th Cir. 2004); In re Brown, 244 B.R. 603, 611 (Bankr. W.D. Va. 2000); see also Campos-Orrego, 175 F.3d at 95 (issues raised for the first time on appeal are deemed waived). It justifies its lack of objection by saying that it never had the notice due under Bankruptcy Rule 3012 that an evidentiary hearing on valuation was going to take place.

Bankruptcy Rule 3012 states:

> The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

Eastern cites the case of Piedmont Trust Bank v. Linkous (In re Linkous), 990 F.2d 160 (4th Cir. 1993), for the proposition that,

---

[15]Eastern also argues that the Debtor should be viewed as holding an easement on so much of the Enfield Lot upon which the Debtor's house sits. It says that this would essentially bring all of the house under the mortgage on the Jasper Lot. Because Eastern raises this argument for the first time on appeal, it is deemed waived. Campos-Orrego v. Rivera, 175 F.3d 89, 95 (1st Cir. 1999).

in order to satisfy the rule, the court must provide creditors with specific notice that a § 506 valuation hearing is to be held. Id. at 162-63.

However, there is some split of authority, with courts in this circuit and others holding that the filing of a Chapter 13 plan is sufficient notice of an intent to strip down and revalue collateral, and no separate motion or hearing is required. See Curtis v. LaSalle Nat'l Bank (In re Curtis), 322 B.R. 470, 481 (Bankr. D. Mass. 2005); McDonough v. Plaistow Coop. Bank (In re McDonough), 166 B.R. 9, 14 (Bankr. D. Mass. 1994); Lee Servicing Co. v. Wolf (In re Wolf), 162 B.R. 98, 107-08 (Bankr. D.N.J. 1993). However, even assuming that the specific notice that Linkous calls for is required in this circuit, it was provided.

The hearing that was held on November 23, 2004, covered, in part, the Debtor's motion for secured status under 11 U.S.C. § 506, and Eastern had notice that that was to be the subject. The hearing was described as "nonevidentiary," but, Eastern argues, the hearing implicitly became evidentiary, without notice, because the court expected Eastern to provide evidence to refute the Debtor's valuation of the Jasper Lot.

At the hearing in question, the bankruptcy judge made very clear that, if valuation were in dispute, then an evidentiary hearing would be necessary. He said that the issue would be decided as a matter of law, without a separate evidentiary hearing,

so long as the valuation was unopposed by Eastern.  Eastern then argued the legal issue of the interpretation of § 1322(b)(2), but did not argue the actual valuation of the Jasper Lot.  At the end of the argument, the bankruptcy judge said, "So that's why you've not raised and spent a lot of time on the valuation issue because you say it doesn't matter."  Counsel for Eastern responded, "Yes, Your Honor.  We don't think we ever get there.  They can't modify the mortgage."

Eastern was thus given several opportunities to request an evidentiary hearing to challenge the valuation of the Jasper Lot, and had sufficient notice that the valuation was likely to stand if it lost on the § 1322(b)(2) issue.  It appears to have made a strategic decision not to argue valuation, or at least to focus all of its energy on the legal issue.  Under these circumstances, we see no violation of Rule 3012.

### 3. Burden of Proof

Eastern's final argument in its appeal from the bankruptcy court's orders is that the court improperly applied the burden of proof.  The court held that Eastern,

> as the party objecting to confirmation, must prove it is entitled to the protection it claims under section 1322(b)(2).  The mortgage document as well as the deed conveying the [Enfield Lot] from Ms. Ness to the Debtor constitute sufficient evidence to call into doubt [Eastern's] proof of claim, in which it asserts a secured claim in the full amount of the note.  Thus the ultimate burden to establish its claim has been shifted back to

> [Eastern].  The Court must now decide whether
> [Eastern] has met its burden.

This holding, the bankruptcy court said, followed from the principle that,

> [a]lthough a properly executed and filed proof of claim is prima facie evidence of the validity and amount of the claim (Bankruptcy Rule 3001(f)), once the objecting party submits sufficient evidence to place the claimant's entitlement in issue, the ultimate burden of proof or persuasion is upon the creditor to establish its claim.

(quoting Brown, 244 B.R. at 608).  Eastern argues that this principle is applicable only to situations where the issue is the "value" or "extent" of a claim, but not to where the issue is one of the applicability of a statute.[16]  It cites the case of In re Ziegler, which held that, "in a § 1322(b) context, the initial burden of production falls on the creditor, with the ultimate burden of persuasion resting on the debtor."  88 B.R. 67, 69 (Bankr. E.D. Pa. 1988).

Even assuming that Ziegler's burden-shifting approach applies in this circuit, we do not see a conflict here.  The issue in Ziegler was whether a pledge of proceeds from a contingent, unliquidated state lawsuit could be sufficient to cure default on a mortgage secured only by a debtor's residence.  The court in that case held that the debtor had not met his burden to show that the

---

[16]Bankruptcy Rule 3001(f) states: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

lawsuit proceeds were more than just speculative. In discussing the burden of proof, the court was referring to proof of the debtor's ability to satisfy claims from particular income streams.[17] This is a subset of the broader principle that the debtor bears the burden of proving that a Chapter 13 plan is feasible  See First Nat'l Bank of Boston v. Fantasia (In re Fantasia), 211 B.R. 420, 423 (B.A.P. 1st Cir. 1997). This is not in conflict with the point that a creditor bears the burden of persuasion as to its proofs of claim. See In re Durastone Co, Inc., 223 B.R. 396, 397-98 (Bankr. D.R.I. 1998). Furthermore, even if it were error to place the burden of persuasion on Eastern with respect to the interpretation of § 1322(b)(2), any error was harmless since the bankruptcy court's interpretation was the correct one.

**B. Rule 60(b) Motions**

We review decisions granting or denying Rule 60(b) motions for abuse of discretion. Roger Edwards, LLC v. Fiddes & Son, Ltd., 427 F.3d 129, 132 (1st Cir. 2005).

After discovering that the Debtor did not in fact own the Enfield Lot, Eastern moved for reconsideration of the bankruptcy court's orders under Rules 60(b)(2) (newly discovered evidence); (b)(3) (fraud, misrepresentation, or other misconduct); and (b)(6)

---

[17]In Ziegler, the court's principal authority in deciding the burden of proof was In re Fries, 68 B.R. 676 (Bankr. E.D. Pa. 1986), which also dealt with the issue of whether certain income streams were adequate to satisfy claims. Ziegler, 88 B.R. at 68-69.

(any other reason justifying relief). The bankruptcy court denied the motions without opinion, and Eastern appealed to the BAP. The BAP thoroughly addressed the arguments and affirmed the bankruptcy court. Eastern Sav. Bank, FSB v. Lafata (In re Lafata), 344 B.R. 715, 723-26 (B.A.P. 1st Cir. 2006). We agree with the BAP, and add the following additional reason for denying the motions.

While Eastern is outraged over what it perceives to be bad behavior by the Debtor, it has not articulated how it was prejudiced. The fact remains that the Debtor does not own the Enfield Lot, and knowing this at the time of the trial would not change the fact that Eastern has no claim on the property. The issue of whether § 1322(b)(2) applied to bar modification was fully before the bankruptcy court, which examined both the case in which the Debtor owned the Enfield Lot, and the case in which he did not. The court's analysis, and ours today, would have applied just as much if the court had known with certainty that the Debtor did not own the Enfield Lot. Indeed, Eastern would arguably have been better off in the case where the Debtor owned both. Then it could -- as it did -- plausibly seek reformation of the mortgage, or something similar. With that option off the table, we do not see how Eastern can now claim that it would be more likely to succeed.

Under Rule 60(b)(2), a movant must show, inter alia, that the newly discovered evidence "is of such a nature that it would probably change the result were a new trial to be granted." U.S.

-22-

Steel v. M. DeMatteo Const. Co., 315 F.3d 43, 52 (1st Cir. 2002). Under Rule 60(b)(3), a movant must show, inter alia, that any misconduct "foreclosed full and fair preparation or presentation of his case." Karak v. Bursaw Oil Corp., 288 F.3d 15, 21 (1st Cir. 2002) (internal quotation marks, citations, and alterations omitted). Since Eastern has not presented an argument, nor do we see one, as to how the bankruptcy court would have reached a different result, neither of these standards were met. For the same reason, Eastern has not shown the "exceptional circumstances justifying extraordinary relief" that must obtain for Rule 60(b)(6) relief to be granted. Ahmed v. Rosenblatt, 118 F.3d 886, 891 (1st Cir. 1997). Therefore, the bankruptcy court and the BAP did not abuse their discretion in denying the motions.

## III. Conclusion

For the forgoing reasons, the decision of the district court affirming the bankruptcy court's orders and the decision of the Bankruptcy Appellate Panel affirming the bankruptcy court's denial of Eastern's Rule 60(b) motion are affirmed. Costs to appellees.